see both counsel, can you both hear me? Yes. All right, Mr. Zolna, you may proceed. Thank you. The briefs submitted on appeal in this case are long and complex, but the issue in this case is really quite simple and straightforward. What was subcommittee two's motivation in excluding the most significant component of the pilot instructor's pay raises in the that this was done for reasons unconnected to any legitimate union objective. They presented evidence and declarations showing that during these deliberations within the subcommittee, members were trying to cut pilot instructors out of their fair share of retro pay. They made comments during these deliberations, members of the subcommittee, to the effect that pilot instructors are less deserving of retro pay because they work from home and therefore are not real pilots. Plaintiffs also submitted evidence showing that when they challenged this decision in an entry union arbitration, the chairman of the subcommittee lied about the reason they did what they did. Mr. Zolna, before you get into the, or further into the facts of the case, could you clarify whether there's any ongoing disagreement about the legal standard, about the motivation of the union, whether the bad motive needs to be the sole. No, you're right. But the district court, I believe, erred when it said that despite this evidence that plaintiffs presented of improper motive and bad faith, the district court erred when it simply accepted ELPA's justification at face value, instead of acknowledging that the plaintiff's evidence caused that justification into doubt. And we have presented evidence that shows that there was a political motivation for decreasing the pilot instructors retro pay, because four of the five of these subcommittee members were line pilots who represented, they were ELPA representatives for line pilots around the country, who were consistently contacting them, emailing them, letting them know how upset they were that they were going to be getting a smaller amount of retro pay. So they had the political motive and the opportunity to do what they did. In terms of the sole motivation standard, which I think you're in agreement that there must be evidence sufficient, to create a jury question, there must be evidence sufficient for a reasonable fact finder. If I could just finish my question. You're agreeing that the legal standard that applies in this case, in the context of this summary judgment decision, is that there has to be sufficient evidence to create a jury issue on the question whether the subcommittee's action was taken solely for the bad motive. Solely by reason of the bad motive. Correct. And the decision, correct. But what we have shown is that just because they, when they developed the general formula, this general rule about using hourly rates from the Delta contract, at some point along the line, they had to come up with different formulas for different employees because they were in different circumstances. And at some point, they did have to address, among other pilot groups, what to do with pilot instructors. And when it came time to deal with them, they had a decision to make. Do we account for their increase in the pay cap or not? And that is the decision that is at issue in this suit. So when you look to the motivation, it is connected to that decision. Why did they treat the pilot instructors this way? And they were warned that they need to include this cap because it's really the biggest part of their pay raise. And we've shown through admissible and very critical evidence that they did, that they disregarded that for reasons unrelated to anything that would promote union as a whole. Mr. Zola, let me try to get at this problem from the back end. I mean, the fact that there was friction, hostility, and competition over a small pie that everybody thought was too small doesn't seem surprising to me at all. The fact that nasty things were said about whether the PIs are real pilots and so on just seems to be part of the natural political give and take within the union as it has to allocate this too small a pie as far as the subcommittee members were concerned. What I'm wondering about here is whether there's a plausible remedy for your theory. Because your in a just world, the pay cap for the pilot instructors would have been raised with respect to the retro pay for the retro pay period. And that nothing else would have changed in the whole 2012 agreement. Is that right? The pay cap changed as well as the hourly rates. Well, that there would have been a change in only the retro pay formula for the pilot instructors and nothing else. Correct? Nothing else would have changed. They would have accounted for their pay cap. I'm sorry, I'm trying to follow your question. Are you asking what they would have done? My question is what the world would have looked like if subcommittee two had decided differently about the retro pay formula for pilot instructors. For example, would it have come up with overall, would the overall agreement have been different with respect to pay prospectively? Where apparently, according to Mr. Arilano, the pilot instructors made out like bandits. Your Honor, I think I get your question. And the answer is that the pay structure, the pay raises that the pilot instructors received would not have changed if the retro pay formula is different. Why not? How do we know? This was a political negotiation. It's like saying how the congressional omnibus budget deal would have been different if one issue had been done differently. Well, they were negotiated by different groups of people. And all under the supervision of the MEC, correct? Correct. All subject to the overall ratification of all the members, right? Correct. So why do we look at only this one issue of the PI retro pay formula and the effect primarily of the pay cap? Well, Your Honor, the retro pay is a function of the pay raise. So whatever the pay raise was, retro pay should reflect those pay gains. So retro pay is really a function of the pay raise in and of itself. So not necessarily. It's a lot more complicated than that, as the briefs in this case show. Well, it was done that way in a kind of esoteric way. But what they could have done is simply just applied the 2012 contract truly retroactively. And that's typically what is done when you have a retroactive payment. You simply take the new contract, the new pay rates in the new contract and apply them retroactively over the period of the delay. But that wasn't done here. They used this delta contract. And we submit that had they truly wanted to use a comparator in the industry, they should have used the same pay rate that Delta pilot instructors were getting paid during the same time period. But they didn't do that. And Captain Fox, the subcommittee chairman, testified that they did know for line pilots what a peer representative was making during that time period. And they used that to calculate retro pay for that. They also knew what a comparator would be for pilot instructors, but they did not use that to calculate their retro pay. That was the testimony of Captain Fox in this case. So the whole thing was done a little backwards for the pilot instructors. And that takes me to the whole notion that the fact that all non-hourly provisions were excluded makes this stationary neutral is not based in reality because that only works if the entire workforce is hourly. But that's not the case here. Pilot instructors are salaried employees. They are not hourly. And by excluding all non-hourly provisions for retro pay, by definition, you're excluding salary provisions for salaried employees. That's antithetical. Subcommittee two has representatives arguing over, would you agree with me this pie that is too small? The 225 million, right? Correct. That was not enough to give everyone full retro pay. That is correct. Right. So you've got an economic and political problem. And I have trouble seeing how there is a right answer to that problem. I have trouble seeing how we could expect it to be resolved without hostility or friction or conflict. And I have the resolution of that issue in isolation. Hence my question about the remedy. Where you all seem to be saying that the pilot instructors are entitled in their ideal world, which Arilano argued for in subcommittee two, to this 73% pay increase and a bigger chunk of the piece of the pie. Well, again, I disagree with that characterization. They were not asking for a bigger slice of the pie. As a percentage of what they lost, they were only seeking equal treatment. Remember, these pilot instructors lost $170,000 during this three-year delay, and they only got compensated $20,000. And what do we make out of, what do we make of, counsel, what do we make of Mr. Arilano's comments in the covertly taped phone call that this was chump change, that the pilot instructors were going to make all this up very quickly going forward and were going to do way better than the line pilots? Again, retro pay is the function of the pay raises. A pay raise is negotiated in a contract, and once that is made, if they made out like banshees, that's great because they were getting severely underpaid for 10 years. They make less today, pilot instructors, than they did in 2000, before the prior contract was even negotiated. And they took a big hit in bankruptcy. They took the biggest pay cut. They made out the exact opposite of banshees 15 years ago. So they should have gotten a big raise. They should be, they were getting paid under market the most out of any other group. So they shouldn't be punished now because they were underpaid the most. That's the exact opposite of what should have happened. Retro is a pure function of the raises that they should have got that was now set to market rate that they were not making during not only the three years, but the entire 10 years before that. Counsel, what is the average tenure of a pilot instructor? Is this something that a pilot stays in for a very long time or do they rotate back to the line? I don't have the specific data on the average number, but I do know just from working in this case that they all are senior pilots. Most have at least 10 to 12, maybe even more years of into the blind line. And I do want to make clear that even if someone flew the line, was a line pilot during part of this three-year period, they were paid retro pay under the line pilot formula for that time. But during the period of time that they worked as pilot instructors, they were paid under the pilot instructor formula. Do they have to be physically qualified to be a line pilot? I love it. Do you say physically, your honor? Physically? Yeah. I mean, again, I'm not, maybe Elvis counsel would probably know maybe a little bit better than me, but obviously, yeah, I mean, you have to be, you can't be a bill of health or anything like that, that would impair your ability to fly an aircraft with hundreds of people on board. That's a They have the option of moving back to the line anytime they want. Correct. They all hold a line position at whatever aircraft they fly and they can, I don't know the exact mechanisms of it, but they do from time to time and they can between the two positions. But it is an important position, obviously, because they're training people how to fly. I do want to make one last point. I know I'm running out of time, but I think this is important that the district court did not address Elpa's lie at the arbitration, nor did Elpa in its response brief. They dismissed that evidence by saying plaintiffs can't use Elpa's lie to impugn the credibility of Mark Arellano. But we've never said that. We never said that in the district court. We never said that on appeal. And we never said that here today. We made clear that that lie shows that Elpa and the And that shows that Elpa had a great application. To be specific, excuse me, counsel, but just to be specific, it was, I mean, Arellano obviously went along with the final deal after having argued for more retropay for pilot instructors. But your problem, as I understand it, was with the assertion that he proposed the ultimate formula. Is that right? Correct. Correct. We're not using this testimony to show that Arellano was lying. We're just showing that this test evidence to show that Elpa had to make a false justification because the true one was improper. It didn't just be like an employment case. If someone says when you're fired, they say it was because of poor performance, but then you look to their performance record and it's sparkly. That under the case law raises an inference of an improper motive for the firing. And I don't know why that same logic wouldn't apply here. In fact, that's what this court found three years ago in the last appeal. And we've come back now with these same facts, plus more, a whole lot more. We've now been able to, and it's a very difficult thing to do in these cases, to kind of peek behind the curtain. But we were able to find some brave members of the United Embassy who stepped forward and told us what was going on. And you can call it political banter or whatever you want, but at the end of the day, they made, they were talking specifically about cutting people out of their retropay. Mr. Sola, your time has expired. Okay. Thank you, Your Honor. Thank you, Mr. Migliore. If it may please the court, Marcus Migliore for the Airline Pilots Association. This court, the last time around, thought it was premature for the district court to dismiss the complaint at the pleading stage prior to document production and sworn testimony and discovery, because although the district court had concluded that ALPA did act in an objectively rational and non-arbitrary manner with its uniform and facially neutral methodology, the other two prongs of the and sent it back to deal with that after discovery. The district court correctly applied this court's governing sole illicit motive standard as stated first in the Barton Brant's case and is restated in this panel's decision in the last time around and other cases as well, and not just here, but other circuits as well. After months of discovery involving thousands of documents, a half dozen depositions, four of which were the committee, two members, in fact, that we talked about. And there was uncontroverted testimony from the PI elected representative, Mark Arellano, that showed that ALPA had at least a subjectively legitimate motive for what it did. There may or may not have been other motives. And legally, I don't think that matters under the standard, and we'll get to that. But there was no question that what Arellano consistently testified to was, hey, I tried to do what I could to get the best deal I could for these guys and deal with this pay cap, but I couldn't do that without messing up and having funky disparate rules for the other line pilots who would have also lost benefits that they would have had. So what they all agreed on, that was a consensus position, is we're going to keep everything the same from the 2003 agreement and just take the pay rates from the Delta contract and plug them in. That's it. And that was for everybody. So that was the rule that applied across the board. And he said, we came to the end of the analysis, including the PI representatives over there, him and Britton, saying we had to do that because any other way of doing it would have created disparate treatment for other people, would have created an indefensible, problematic situation that would have, in fact, perhaps led to a lawsuit from the others. Mr. McNary, if I could ask you a legal question about this, or a corollary and legal question about the point that you're making, and that is we need to consider the context here, which is labor negotiations and the union's duty of good faith to represent units or subgroups within the union that might have intense competing interests. And here, given the too small pot of money, as Judge Hamilton pointed out, and the competition for share of that, what qualifies as an illicit motive in this context? I'm not sure that it can be stripped of the context because in assessing the sufficiency of the motive evidence here to create a jury question on that key issue, it of an intense nature about the conflicting interests of the different subgroups that are competing for the pie isn't evidence of an illicit motive. It goes to the nature of the tradeoffs that the union has to consider in arriving at its decisions. So an illicit motive has to be something more than that, or at least that strikes me as a legal requirement in this context. Can you address that? Yes, Chief Judge Sykes, that's exactly correct. In the context, particularly in the context where you have to make that balancing between the different groups that you have to deal with and represent, the Supreme Court, you know, that's from the Lockridge case to the O'Neill case, in this court, in the Barton Brands case, and in Rake Straw, and frankly, in the panel's early decision, you have to recognize that, you know, if you're going to just have people sloganeering about, hey, my group didn't get what it should have gotten, that's not sufficient. And it's also not sufficient to say an even-handed methodology that impacts one of those groups, as you say, in this zero-sum deal, it might impact them more than the other. That is not enough either. What Lockridge says, specifically, the Supreme Court said in the Lockridge case, is you have to have an illicit, improper motive that's unconnected to legitimate union objectives, such as race discrimination, gender discrimination, things of that nature. But the normal give and take of dealing with the various subgroups that a union has to balance the interests of is not part of that. And that's why O'Neill said, I'm sorry, ma'am. And to bring it down into this case, even something as specific as the pilot instructors got a good deal with the 2012 contract, in terms of their pay, I think it was 2012, right? Yes, ma'am. So that ought to be a factor in the mix of many inputs here in deciding how they should be compensated under the retropay formula. That's absolutely correct. You can't just have the adversarial or litigation microscope focused on one segment. You have to look at the totality of the bargaining deal that the union made balancing those interests. That's what the Supreme Court said. Some form of allocation is inevitable in O'Neill. In the Alpha v. O'Neill case and in the Cunningham case, this circuit also said something similar to that. You have to look at the entirety of it. And as the district judge said, what the plaintiffs are looking for here is to win all the battles. They're not claiming that they lost most of them. They're not claiming they won every single last one. They didn't really lose anything here. They were treated the same as everybody else. And again, the consistent case law is, from this circuit and for it, in this case, legitimate justification was clearly on the record that it was designed to avoid disparate treatment. That's clearly in the record. It's undisputed. That's it. And under Barton Brands, that's what the court said. In order to be absolved of liability, the union must show some objective justification beyond placating the desires of the majority over the minority. That's 529 Fed Second and 800. I don't know that I would say the plaintiffs won all the battles. They certainly lost on the retro pay battle, but they did all right overall, it looks like. They did. Mr. Arellano got 73%. We believe the baseline minimum that they got overall was a 60% raise. And their own evidence, as you indicate, doesn't really indicate how much better they would have done or how they could have done better under a different scenario. The DFR, of course, recognizes the union has to have the flexibility to balance. And there's a lot of different ways, quite honestly, this could have been done that would have been legitimate, including but not limited to this method. And that's the essence of why the deference exists for the union, because you have to have the flexibility to deal with that rather than someone just sloganeering, as the Rakestraw Court said, and said, hey, we got less than we should have. And even in a mixed motive analysis situation, this court and other courts, I'm sorry, the First Circuit and the Ninth Circuit for sure, have also said, that's why you have to have that sole motive. And going back to what the Chief Judge said, that's why the standard is set the way it is. Because if you didn't do that, it would be a highly corrosive situation for labor unions to be able to function. Because in every single bargaining situation, we'd be subject to some complaint from some of the subgroups that we have to deal with. And this is not an immutable class. The PIs, the pilot instructors, it's not an immutable protected characteristic like race or gender or anything like that, as was indicated in the colloquy with Judge Ripple. They can move in and out of this category of job. They're free to do that. They do fly the line to maintain currency, just to further answer the question of Judge Ripple. And they do have to have a but they're line pilots who also do this and mainly do this, but they can also fly. So this isn't a situation like you had in the Steele case, where the DFR first came about back in the 40s under the Railway Labor Act for the first time, when it was race discrimination. That's how the DFR actually started. That's the first DFR case. If you go back and look, that's how it all started, and justifiably so. But this is a very, very different situation than that kind of illicit activity. And to further respond, I think, to what Judge Hamilton said, I think there is a causation problem here. How are they going to really show what else they were going to get? Their theories are, well, we could have used the Delta contract. We could have used the 2012 United contract. But there was no pre-baked deal to do that, the way there was, in fact, in Barton Brands, when the minority employees who were brought in by merger were basically sacrificed, when they had previously had seniority rights that were taken away to avoid a layoff of the majority. That's a very different situation. That's causation. There's really no remedy theory here that we can see that gets you to causation in addition. Now, the district judge didn't get into that, but of course, this court can comment upon that further and further substantiate what the district court did. But that's basically all I have. Yes? I'd like you to address more specifically, though, the plaintiff's theory that Fox and Alpo were dishonest in the way they presented the outcome of Subcommittee 2. Yes. And particularly in Erlano's role. Yes. The bottom line is what they're wrong or exaggerated was that he proposed the method, as opposed to supporting the method. There's really no controversy that he supported the method and came to the method at the end of the day because he tried to get a better deal for his people. He tried to deal with the pay cap. He couldn't get it in there without creating disparate, as he called it, funky rules, and then resigned himself, I think, as he later said, that this was the fair way to do it without creating that disparate set of rules. And so, that's the context of the quote-unquote misrepresentation or lie, whatever you want to call it. But it's certainly not material under the standard, Your Honor, under the Barton Brand standard. Again, it can't be gainsaid that we had an objective justification for the even-handed. I assume that the exaggeration, if we want to call it that, that he proposed it was quickly rebutted in the arbitration process? Yes, Your Honor. I mean, basically, it was very clear, based on all of the testimony, that the PIs wanted more, and they couldn't get more, and that we did this even-handed deal precisely to try to keep things even for everybody, at least on a facial level. But again, it's what the district court said properly, in our view, and it's not really a material issue. If it was, and I'm going back to what the district court said, actually, the argument of the summary judgment, he said if it was a lie, it was a stupid, immaterial lie. And I agree with that. I'm not conceding that it was a lie, because honestly, I don't believe that that's, that was inaccurate. In fact, Mr. Arneano first testified in his deposition, I did propose it, and then later on, after four or five hours, he backed off of that. So, you know, I can only say that based on the fact that I was involved with all those things. But if it was a lie, it was not a material lie under the standard, Your Honor. And with that, I rest on the brief, unless the panel has any further questions for Albrecht. Apparently not. Thank you very much. Thank you, Your Honor. Mr. Zola, your time had expired. If you have some final thoughts and rebuttal, I'll give you an extra minute. If I could have one minute? Yes, Your Honor. Certainly. The purpose of this money, Your Honor, was not just divvied up any way Alpa saw fit. And I think we could set a bad precedent here today by allowing a union to distribute retro pay in a way where it kind of makes its own decisions on who should get what based on what happened in the contract. Retro pay is solely a function of pay raise, to reflect that amount. And I think allowing a union to kind of do what it wants with retro pay money would cause a lot of problems in the future. I think we've come up with enough evidence here today to at least have a trial on what the motivation was with this subcommittee. And the last thing I want to point out is that this money was not a discretionary fund. These were lost wages that pilots rely on to pay their mortgage and to send their kids to college and pay their groceries. Pilot instructors rely on retro pay to compensate these being underpaid for three years. And they were denied that, first by their employer, United, for delaying three years, and now by their own union. Thank you. Thank you very much. Our thanks to both council. The case is taken under advice.